IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| STEVEN W. McRAVEN,        ) | |
| ) | |
|     Plaintiff,    ) | |
| ) | Case No. 3:06cv0489 |
| v.        ) | Judge Thomas A. Wiseman, Jr. |
| ) | |
| MICHAEL J. ASTRUE, [1]    ) | |
| Commissioner of Social Security,    ) | |
| ) | |
|     Defendant.    ) | |

**MEMORANDUM OPINION**

This civil action was filed pursuant to 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Commissioner of Social Security ("Defendant" or "Commissioner") denying Plaintiff's claim for Supplemental Security Insurance ("SSI") benefits, as provided under Title XVI of the Social Security Act ("the Act"), as amended. Currently pending is Plaintiff's Motion for Judgment on the Administrative Record. (Doc. No. 9.) Defendant has filed a Response, arguing that the decision of the Commissioner was supported by substantial evidence and should be affirmed. (Doc. No. 16.) Plaintiff has filed a Reply. (Doc. No. 21.)

For the reasons stated below, Plaintiff's Motion for Judgment on the Administrative Record will be denied and the decision of the Commissioner affirmed.

**I.      INTRODUCTION**

Plaintiff filed his application for Supplemental Security Income ("SSI") benefits on June 3 2002, alleging that he had been disabled since August 2001, due to back, leg, and hip pain, hypertension, heart disease, "heart attack," diabetes, and bipolar disorder. (*See, e.g.*, Doc. No. 1-E, Attachment ("AR"), at 65–78.) Plaintiff's application was denied both initially (AR 39–41) and upon reconsideration (AR 46-47). Plaintiff subsequently requested (AR 48–49) and received (AR 27-30) a hearing. Plaintiff's hearing was conducted on December 7, 2004, by Administrative Law Judge ("ALJ") John P. Garner. (AR 281–300.) Plaintiff and Vocational Expert Gordon H. Doss appeared and testified. (*Id.*)

---

[1]  Michael J. Astrue is automatically substituted for his predecessor Jo Anne Barnhart as Commissioner of the Social Security Administration. Fed. R. Civ. P. 25(d)(1).

On September 19, 2005, the ALJ issued a decision unfavorable to Plaintiff, finding that Plaintiff was not disabled within the meaning of the Social Security Act and Regulations. (AR 15–26.) Specifically, the ALJ made the following findings of fact:

1.    The claimant has not engaged in substantial gainful activity since the SSI application was filed on June 3, 2002.

2.    The claimant has a combination of impairments considered "severe," which includes lumbar degenerative disc and joint disease, cardiovascular disease, obesity, and post traumatic stress disorder with depression and a personality disorder.

3.    This combination of impairments does not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No.4.

4.    The claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

5.    The claimant has the residual functional capacity to perform light work activity, which accommodates the occasional lifting and/or carrying of 20 pounds; frequent lifting and/or carrying of 10 pounds; standing and/or walking six hours in an eight hour day; sitting six hours in an eight hour day; occasional climbing of ladders, ropes, scaffolds, stairs and ramps; occasional balancing, stooping, kneeling, crouching and crawling; the avoidance of concentrated exposure to extreme cold and heat; and moderate limitations in the ability to carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination or proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, interact occasionally with the general public, accept instructions and respond appropriately to criticism from supervisors and respond appropriately to changes in the work setting. Also included in the mental RFC are the physician comments at Exhibit 17F, page 3, *i.e.*, the claimant has the ability to carry out simple and some detailed tasks, his attention and concentration will be adequate, his persistence and pace will be adequate, he can work adequately with others, he can ask questions and respond adequately to criticism, and he can respond adequately to changes in the work setting.

6.    The claimant is unable to perform any past work.

7.    The claimant is 48 years old.

8.    The claimant has a high school equivalence education.

9.    The claimant has no transferable skills.

10.    Based on VE testimony and considering claimant's age, education, past work experience and residual functional capacity, Medical-Vocational Rule 202.20, used as a framework for decision-making, indicates there are a significant number of jobs in the national economy that he can perform.

11.    The claimant has been "not disabled," as defined in the Act, since June 3, 2002.

(AR 25–26.)

On September 23, 2005, Plaintiff timely filed a request for review of the hearing decision. (AR 10–11.) On February 24, 2006, the Appeals Council issued a letter declining to review the case (AR 6–9), thereby rendering the decision of the ALJ the final decision of the Commissioner. This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. § 405(g). If the Commissioner's findings are supported by substantial evidence, based upon the record as a whole, then these findings are conclusive. *Id.*

## II.     REVIEW OF THE RECORD

### A.     The Medical Evidence

Plaintiff alleges disability due to back, hip, and leg pain, hypertension, heart disease, "heart attack," diabetes, and bipolar disorder. (AR 70.)

After being "recently released from prison," Plaintiff visited Metropolitan Nashville General Hospital ("Metropolitan General") on September 4, 2001 for a refill of his medication. Nurse Practitioner Becker diagnosed Plaintiff with Hypertension and Type 2 Diabetes, continued his medications of "Captopril" and "HCTZ," and prescribed "Glucatrol." (AR 117.)

Plaintiff returned to Metropolitan General on September 25, 2001 for a follow-up regarding his hypertension and diabetes. Noting that Plaintiff had been "compliant with meds" and that Plaintiff felt well, Nurse Practitioner Becker diagnosed Plaintiff with Hypertension, Type 2 Diabetes, Generalized Depression, and Anxiety. (AR 116.) Plaintiff scored a "0" in the "risk" category of his Diabetic Foot Screen, indicating "no loss of protective sensation." (AR 115.) Plaintiff's ECG displayed a "normal sinus rhythm," but his bloodwork indicated an elevated level of "Hemogloben A1C." (AR 112–14.)

Plaintiff returned to Metropolitan General on December 18, 2001 to see Nurse Practitioner Becker for another follow-up, complaining of headache, dizziness, blurred vision, and pain in his left hip and leg. Plaintiff reported that he "may have torn a muscle." (AR 111.) Nurse Practitioner Becker diagnosed Plaintiff with Hypertenstion, Type 2 Diabetes, and Depression, administered Tylenol and a flu vaccination, instructed Plaintiff to "check [his] feet daily," and prescribed Vioxx. (*Id.*) Also on December 18, 2001, Registered Nurse Marim Jenkins completed an "Admission Pain Assessment Form" regarding Plaintiff wherein Plaintiff rated his pain as a 6 on a scale of 1 to 10. (AR 110.) Plaintiff reported that his pain had

begun three weeks prior when he was "moving furniture" and, when asked what triggers his pain, Plaintiff responded that he "hurts all the time." (*Id.*)

On June 10, 2002, Plaintiff began treatment at Centerstone Community Mental Health Centers (AR 228–29.)  Robin Toole, LCSW, MSSW, noted Plaintiff's appearance as "appropriate," his mood/affect as "anxious," his behavior as "appropriate," his speech as "organized," his thought process as "normal," his thought content as "within normal limits," his insight as "fair," his judgment as "poor," his motivation for treatment as "fair," and his "vegetative disturbance" as "pleasure, sleep."  With regard to Plaintiff's activities of daily living, Clinician Toole noted that he "mows [his] grass [and] gardens" and  "doesn't leave home."  Clinician Toole also noted that, with regard to Plaintiff's interpersonal functioning, he "avoids all contact with people" and has "serious trust problems."  Clinician Toole opined that Plaintiff's ability to adapt to change was "poor," but that Plaintiff's concentration was "adequate."  Plaintiff's then-current stressors were listed to be "no income" and "conflict with neighbors."  (AR 228.)

Clinicians Robin Toole, Kari Reeves, and David Highfield treated Plaintiff at Centerstone Community Mental Health Center from June 2002 to February 2003.  (AR 191–229.)  Plaintiff's progress notes indicate recurring themes of isolation from people, anger, frustration, and inability to interact with others.  (*See generally id.*)

On June 18, 2002, Plaintiff sought treatment for paranoia and depression at Hickman County Mental Health, at Hickman County Baptist Hospital.  (AR 118-19.)  Plaintiff reported "depressed mood, feelings of hopelessness, excessive worry, chronic anxiety, easily frustrated, easily angered, aggressive impulses, violent outbursts, restlessness, anhedonia, sleeps for days then not at all, energy: fluctuates (same as sleep), appetite: fair, increased paranoia, hides when people come over / knock on the door." (AR 118.)  Plaintiff was prescribed Prozac and Xanax and advised to continue individual therapy with Clinician Toole.  (AR 119.)

On August 27, 2002, Plaintiff saw Dr. Marek Durakiewiez at Baptist Hickman Community Hospital, with complaints of "occasional [heart] palpitations," "lower back pain for a long time radiating to both legs," anxiety, and depression.  (AR 134.)  Plaintiff's physical examination revealed "lower back muscular tenderness, more on the left side." (*Id.*)  Plaintiff's straight leg raise was "positive on both sides, more on the left side." (*Id.*)  Dr. Durakiewiez ordered blood work, a urinalysis, an "LS x-ray," an "echo and

EKG," and a "hepatitis profile." (AR 136.) Dr. Durakiewiez continued Plaintiff's prescriptions of Prozac, Xanax, and Seroquel, and changed his prescription for Captopril to Altace. (*Id.*)

On August 28, 2002, Plaintiff's x-ray report from Baptist Hickman Community Hospital revealed "probable moderate degenerative joint disease of the lower lumbar spine," "suggest[ed] degenerative disc disease at L5-S1," "minimal spondylosis," and "possible old mild compression fracture deformity of T11." (AR 135.) On August 30, 2002, Plaintiff's blood work showed "high cholesterol" at 238, a high level of trigylercerides at 277, a high level of lymphocytes, and "positive" results for "Hepatitis C Ab." (AR 121–25.)

On September 12, 2002, Plaintiff saw Dr. Darrel R. Rinehart at Columbia Regional Medical Center for a "DDS consultative examination." (AR 128–31.) Plaintiff reported that "he has pain, which is on a daily basis [that] is a constant burning, aching pain in the low back area, which has a tendency to radiate down into his left leg," and that his left knee "pops a lot" and causes him difficulty going up and down steps. (AR 128–29.) Plaintiff also reported, inter alia, that "any type of physical exertion," "stooping, standing, bending or lifting," exacerbates his pain. (AR 128.) Plaintiff relayed "a significant history of bipolar disorder as well as post traumatic stress disorder." (AR 129.) Dr. Rinehart's physical examination of Plaintiff revealed that Plaintiff had normal range of motion in his hands, wrists, elbows, shoulders, neck, feet, ankles, and knees. (AR 130.) Plaintiff's "hips could flex to a little past 90 degrees and he complained of pain on extreme flexion." (*Id.*) His internal and external rotation of the hips was normal, but Plaintiff's "straight leg reflex on the right at 45 degrees produced low back pain and on the left at about 25-30 degrees produced low back pain." (*Id.*) Plaintiff's physical examination also revealed "a slight limp" favoring Plaintiff's left leg. (*Id.*) Plaintiff was "unable to do heel to toe walking" and "in general he was just slow and unsteady." (*Id.*) Plaintiff had "no back spasms" and had "about 65 degrees anterior lumbosacral flexion" when asked to bend over and touch his toes. (*Id.*) Dr. Rinehart observed that Plaintiff's muscle strength in his lower extremities was "really diffusely weak, mostly due to pain on testing at about 3/5." (*Id.*) Dr. Rinehart opined that Plaintiff could sit, stand, and walk "at lower levels intermittently for maybe 3-4 hours in an 8-hour workday" and lift "15-20 pounds intermittently over that same period of time." (AR 131.)

On September 27, 2002, Plaintiff saw Dr. Durakiewicz, complaining of "back pain that radiates to the left leg" and "left hip pain." (AR 133.) Plaintiff's straight leg raise was "mildly positive on the left side," and his physical examination revealed "lower back muscular tenderness." (*Id.*) Dr. Durakiewicz diagnosed Plaintiff with "chronic lower back pain" and prescribed Vioxx, Protonix, Robaxin, Lortab, and Glucotrol. (*Id.*)

On October 4, 2002, Plaintiff received an MRI of his lumbar spine, which revealed "moderate central and left paracentral disk protrusion at the L5-S1 level," "moderate neural foraminal stenosis bilateral at this level, greater on the left," "moderate to severe facet degenerative changes," "mild spinal stenosis at the L4-5 level secondary to moderate to severe changes of spondylosis and facet joint hypertrophy with small central disk protrusion," bilateral "neural foraminal stenosis," and "moderate sized disk protrusion at the L3-4 level with tracking of the disk material inferiorly." (AR 139.)

On October 10, 2002, upon Dr. Durakiewicz's request, Plaintiff underwent an Echocardiogram, which revealed an "enlarged" left ventricle "with mild apical hypokinesis," "dilated left atrium," "normal valve morphology," "trace mitral regurgitation," and "normal appearing pericardium." (AR 140.)

On October 16, 2002, DDS Examiner Jeneia Crawford evaluated Plaintiff at the Lewis County Mental Health Center. (AR 141–44.) Examiner Crawford found that Plaintiff "put forth good effort on tests," had "intact" sensorium, had "depressed" and "restricted" affect, had "vigilant" attention, had difficulty concentrating and "persecuted" thought content, had an "angry" facial expression but was cooperative, had "preoccupations of social maladjustment," had "poor" judgment and "impulsive" decision-making, and was "self centered," "street smart and heedless." (AR 143–44.) Examiner Crawford observed that Plaintiff had difficulty walking and that he walked with a cane. (AR 143.) Examiner Crawford opined that Plaintiff's "ability to understand, remember, and carry out short and simple instructions was not impaired" and his "ability to understand and remember detailed instructions was moderately impaired." (AR 144.) Examiner Crawford further opined that Plaintiff's "ability to make judgments on simple work related decision was mildly impaired"; his ability to interact "appropriately with the public, with supervisors, and with co-workers was severely impaired," his ability to "respond appropriately to work pressures in a usual work setting and to changes in a routine work setting was moderately impaired," and that he was "aggressive and antisocial." (*Id.*) Examiner Crawford diagnosed

Plaintiff with "posttraumatic stress disorder with anxiety" and "antisocial personality disorder," and noted a "current GAF 50." (*Id.*)

On November 7, 2002, DDS Physician Dr. Regan completed both a Mental Residual Functional Capacity Assessment and a Psychiatric Review Technique Form regarding Plaintiff. (AR 146–63.) In the Mental RFC, Dr. Regan found that Plaintiff was "markedly limited" in his abilities to "understand and remember detailed instructions," "carry out detailed instructions," and interact appropriately with the general public." (AR 146–47.) Dr. Regan further found that Plaintiff was "moderately limited" in his abilities to "maintain attention and concentration for extended periods" and "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." (*Id.*) Dr. Regan found that Plaintiff was "not significantly limited" in all other areas on the form. (*Id.*) Dr. Regan opined that Plaintiff was "unable to perform detailed tasks" but had "no problem with simple tasks." (AR 148.) He also noted that Plaintiff was "unable to relate to the public" but had "no problem with supervisors [and] coworkers." (*Id.*)

In his Psychiatric Review Technique Form, Dr. Regan noted that Plaintiff experienced antisocial personality disorder and anxiety disorder with "recurrent and intrusive recollections of a traumatic experience." (AR 155, 157.) Dr. Regan opined that Plaintiff experienced "moderate" difficulties in "maintaining concentration, persistence, or pace, and a "mild" degree of limitation in his "restriction of activities of daily living" and "maintaining social functioning." (AR 160.) He further opined that Plaintiff experienced "one or two" "episodes of decompensation, each of extended duration." (*Id.*)

On November 17, 2002, DDS Physician Dr. Lawrence G. Schull completed a Physical RFC Assessment regarding Plaintiff, wherein he opined that Plaintiff could occasionally lift and/ or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk about 6 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, and push and/or pull without limitation. (AR 165.) Dr. Schull noted that Plaintiff was "frequently" limited in climbing ramps/stairs, balancing, kneeling, crouching, and crawling, and "occasionally" limited in climbing ladder/robe/scaffolds and stooping. (AR 166.) Dr. Schull did not find Plaintiff to have any "manipulative," "visual," "communicative," or "environmental" limitations. (AR 167–68.)

On February 10, 2003, Clinician Highfield completed a "Mental Status / Medical Questionnaire" for Plaintiff in support of his disabilities claim.  (AR 178–79.)  In that Questionnaire, Clinician Highfield indicated that Plaintiff exhibited "inflexible or maladaptive" personality traits that "cause[d] either significant impairment in social or occupational functioning or subjective distress."  (AR 178.)  Clinician Highfield also indicated that Plaintiff had "deeply ingrained, maladaptive patterns of behavior associate[d] with . . . pathology inappropriate suspiciousness or hostility [and] persistent disturbance of mood or affect."  (*Id.*)  Clinician Highfield opined that Plaintiff's "condition resulted in:  marked restriction of activities of daily living; marked difficulties in maintaining social functioning; deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere); and repeated episodes of deterioration or decompensation in work or work-like settings which cause [him] to withdraw from that situation or to experience exacerbation of signs and symptoms. . . ."  (*Id.*)  Clinician Highfield explained that Plaintiff's mood disorder was "for the most part" "arrested and manageable with consist [sic] use of medicine," but that his personality disorder interfered with his relationships.  (AR 179.)

Clinician Highfield also completed a "Mental Status / Capabilities Questionnaire" regarding Plaintiff on February 10, 2003.  (AR 181–82.)  In that Questionnaire, Clinician Highfield indicated that Plaintiff did not have the abilities to "maintain attention for extended periods of 2-hour segments"; "maintain regular attendance and be punctual within customary tolerances"; "sustain an ordinary routine without special supervision"; "work in coordination with or proximity to others without being (unduly) distracted by them"; "complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods"; "ask simple questions or request assistance"; "accept instructions and respond appropriately to criticism from supervisors"; "respond appropriately to changes in a (routine) work setting"; and "be aware of normal hazards and take appropriate precautions."  (AR 181.)  Clinician Highfield explained, "[Plaintiff] does not 'play well with others.'  He is abrupt and aggressive.  He does not see others['] point of view and has little empathy for what others feels [sic].  Work settings would be explosive and dangerous."  (AR 182.)

On March 3, 2003, DDS Physician Dr. Victor A. Pestrak completed a Mental RFC Assessment regarding Plaintiff. (AR 230–32.) Dr. Pestrak found that Plaintiff was "moderately limited" in his abilities to "carry out detailed instructions," "maintain attention and concentration for extended periods," "work in coordination with or proximity to others without being distracted by them," "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods," "interact appropriately with the general public," "accept instructions and respond appropriately to criticism from supervisors," and "respond appropriately to changes in the work setting." (AR 230–31.) Dr. Pestrak found that Plaintiff was "not significantly limited" in all other areas on the form. (*Id.*) Dr. Pestrak concluded that Plaintiff "can carry out simple and some detailed tasks"; that Plaintiff's attention, concentration, persistence, pace, ability to work with others, ability to ask questions, and ability to respond to criticism would be "adequate"; and that Plaintiff would be able to "adequately" respond to changes in the work setting. (AR 232.)

Dr. Pestrak also completed a Psychiatric Review Technique Form regarding Plaintiff on March 3, 2003. (AR 233–46.) In his Psychiatric Review Technique Form, Dr. Pestrak found that Plaintiff had "moderate" difficulty "maintaining social functioning" and "maintaining concentration, persistence, or pace," and "mild" "restriction of activities of daily living." (AR 243.) Dr. Pestrak found that Plaintiff did not have any "episodes of decompensation, each of extended duration." (*Id.*) Dr. Pestrak diagnosed Plaintiff with post traumatic stress disorder and antisocial personality disorder. (AR 238, 240, 245.) Dr. Pestrak found that Plaintiff did not have any "significant" impairment, and he opined that Plaintiff "can travel, can shop, can do chores, can prepare simple meals, and can interact with others." Dr. Pestrak further noted that "some [of Plaintiff's] restrictions are self-imposed." (AR 245.)

On March 28, 2003, a DDS Physician completed a Physical RFC Assessment regarding Plaintiff. (AR 247–52.) The physician opined that Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk about 6 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, and pull and/or pull without limitation. (AR 248.) The physician further opined that Plaintiff was "occasionally" limited in all postural activities, but did not have any manipulative, visual, or communicative limitations. (AR 249–50.) With regard to environmental limitations, the physician opined that Plaintiff should avoid concentrated exposure to extreme heat and cold but was otherwise unlimited.

(AR 250.) The physician noted, "ASE MD is overly restrictive because, in view of physical findings, CL is capable of at least a light level of activity." (AR 251.)

On January 16, 2004, Dr. Ralph Hobbs completed a "Pain Management Progress Note" regarding Plaintiff and continued completing these Progress Notes through July 2, 2004. (AR 257–69.) On February 12, 2004, Plaintiff reported that his pain could reach a severity level of 10 on a scale of 1 to 10, that "at its best" his pain would be a 3, and that his pain was then a 6. (AR. 267.) On April 8, 2004, Plaintiff reported that his pain could reach a severity level of 10 on a scale of 1 to 10, but that with medication, it could be reduced to a 4. (AR 262.)

On July 26, 2004, Dr. Hobbs completed a Medical Source Statement of Ability to do Work-Related Activities (Physical) form regarding Plaintiff. (AR 253–56.) Dr. Hobbs opined that Plaintiff could occasionally lift and/or carry less than 10 pounds, frequently lift and/or carry less than 10 pounds, and stand and/or walk approximately 2 hours in an 8-hour workday. (AR 253–54.) Dr. Hobbs further opined that Plaintiff's physical impairments affected his abilities to sit and push and/or pull, but Dr. Hobbs did not note to what extent these abilities were affected. (AR 255.) Dr. Hobbs reported that Plaintiff's postural and visual/communicative abilities were "never" limited but that Plaintiff was "limited" in his reaching because "excessive reaching" could increase the chronic pain in his lower back. (AR 256.) With the exception of "vibration" and "hazards," Dr. Hobbs found that Plaintiff did not have any environmental limitations. (*Id.*) Dr. Hobbs noted that "limited mobility prevents work around hazardous machinery and vibration [ ] would certainly cause an increase in his chronic pain index." (*Id.*)

On December 2, 2004, Clinical Psychologist Dr. Mary Francis Hall wrote a letter to Plaintiff's attorney regarding her treatment of Plaintiff. (AR 273–74.) Dr. Hall reported that Plaintiff has "had great physical difficulty in moving freely" and has been in "acute physical discomfort." (AR 273.) Dr. Hall further reported that Plaintiff suffered from post traumatic stress disorder that manifested in his experiencing "serious panic reactions," "heightened alertness in public situations," suspiciousness, breathing problems, nightmares, and poor sleep. (*Id.*) She noted that pain medication was "essential," as his was in "constant pain." (*Id.*) She also noted that, after psychotherapy, Plaintiff had "greatly developed his self control" and had "gained more inner peace . . . along with mood stabilization." (AR 274.) Dr. Hall stated that when Plaintiff now experiences flashbacks, "he is better able to accept and manage them."

(*Id.*)  Dr. Hall reported that Plaintiff had been "conscientious about keeping appointments, despite the distance he has to come and problems with his vehicle."  (*Id.*)  She added, "for those people and animals for whom he feels responsibility, he is loyal and expends great, often creative, effort – at considerable physical/emotional expense to himself."  (*Id.*)  Dr. Hall then opined, however, that Plaintiff "cannot, must not" hold a job.  (*Id.*)  Dr. Hall observed that Plaintiff "has the wisdom to isolate himself from crowds as much as possible," adding that "he tries to avoid situations which are likely to set off anger or fear reactions."  (*Id.*)  She noted that Plaintiff was "doing so well maintaining a degree of equilibrium that it would be devastating for him to try to function in some sort of public or noisy setting, with outside demand or requirements imposed."  (*Id.*)  She also noted Plaintiff's "many physical limitations," including difficulty in "standing for a significant period of time" and "slow, difficult, and painful" walking.  (*Id.*)

On January 6, 2005, Dr. Hall wrote to Plaintiff's attorney again and reported that, through a safe, therapeutic environment, Plaintiff "has come to have a more positive mood and to maintain a responsible, law abiding life."  (AR 276.)

### B.    Plaintiff's Testimony

Plaintiff was born on September 23, 1957, and has a ninth grade education.  (AR 60, 285.) Plaintiff later earned his GED at the "Turning Center," a facility for "adult offenders."  (AR 291.)  Plaintiff reported that he served in Vietnam for six months, spanning the latter part of 1973 and the first part of 1974, as a "door gunner" in the "helicopter combat support squadron two."  (AR 290.)

Plaintiff testified that the last job he held was in 2001, working for Taco Bell "shortly after being released from prison."  (AR 285.)  Plaintiff stated that he worked for Taco Bell for "approximately two weeks or so."  (*Id.*)  Plaintiff explained that he got fired because "they put [him] on the cash register, and [he] told them [he] didn't want to work on the cash register" but would "rather work in the back where [he] didn't have to deal with any people," but they did not listen and put him on the cash register anyway and when he was put on the cash register, he "had a confrontation with one of the customers" wherein he "tried to jerk [the customer] through a window."  (*Id.*)  Since being released from prison, Plaintiff stated that he has had no other work.  (AR 286.)

In 1988, 1989, and 1990, Plaintiff reported that he worked as an "iron worker . . . putting on metal roofs and stuff like that."  (AR 291.)

Plaintiff testified that, on a typical day, he is woken up by pain because his medication has worn off by the morning. (AR 286.) Plaintiff stated: "I'll get up and sit on the side of the bed and take a morphine pill, and sit back and wait for it to start taking the edge off of everything. And then get up and try to get coffee made from there, and that's about it." (*Id.*)

Plaintiff testified that he would have "to take breaks all the time" throughout the day. (AR 286.) Plaintiff reported that he would have to "sit down and rest" and that he could not do any "heavy lifting or anything like that." (*Id.*) Plaintiff testified that "even bending over to tie [his] shoes" could cause his back "to go out." (*Id.*) He further stated, "It takes me forever to get anything done." (*Id.*)

With regard to chores, Plaintiff stated that he would help care for the dogs and do "whatever comes up that needs to be done." (AR 287.) Plaintiff further stated that if his girlfriend "needs something done . . . or [needs] help cleaning," he would do that. (*Id.*)

Plaintiff stated that he had four "attack" dogs that were "very aggressive" "rottweilers and wolves." (AR 287.) Plaintiff explained that he had them "strategically placed where no one can get in the driveway or the front door" because he was "just not real fond of company" and "so nobody bothers me." (*Id.*)

With regard to his personal relationships, Plaintiff stated that he did not socialize with anyone other than his girlfriend, and that he would "talk to [his] mother on the phone." (AR 287.) Plaintiff reported that he did not have any relationships other than with his girlfriend and his mother, specifically stating, "I don't want any friends." (AR 289.) When asked how often he went out into public, Plaintiff stated, "Never, if I don't have to." (*Id.*)

Plaintiff reported that the last time he had gone into public prior to the hearing was about two weeks before, on his last visit to see Dr. Hall. (AR 289.) Plaintiff testified that, when he did go out into public, he "usually . . . has panic attacks" and would try to leave "as soon as [he] can." (*Id.*) Plaintiff further testified that he would become "nervous" and "scared" when he would look at people around him. (*Id.*)

Plaintiff reported that his girlfriend made him go to counseling after being released from prison. (AR 287–88.) When questioned about this counseling, Plaintiff testified that the counseling "really doesn't do anything for [him]" because he just reports what he thinks and feels and "there's really no plan or action to do anything about it." (AR 288.) Plaintiff recalled having conflicts with his prior counselors. (*Id.*)

### C.    Vocational Testimony

Vocational Expert ("VE"),Gordon H. Doss also testified at Plaintiff's hearing.  (AR 282.)  The VE characterized Plaintiff's past work as a fast-food worker at Taco Bell as "light and unskilled."  (AR 291.)  The VE characterized Plaintiff's past work as a construction worker as "medium to heavy. . . . var[ying] from unskilled to the lower level of semi-skilled."  (*Id.*)

The ALJ presented the VE with a number of hypothetical situations paralleling that of Plaintiff and asked if the hypothetical claimant would be able to do any of the work that Plaintiff had done in the past.  (AR 291–95.)  In his first hypothetical, the ALJ asked the VE what "jobs would be available to a person Claimant's age, education, and having the capabilities described in Exhibit 12F," the DDS physician's Physical RFC Assessment.  (AR 292.)  In that RFC Assessment, the DDS physician described an individual capable of lifting 20 pounds occasionally, lifting 10 pounds frequently, standing, walking, and sitting six out of eight hours, occasionally climbing and stooping, and frequently balancing, kneeling, crouching, or crawling.  (AR 164–71.)

The VE answered that "a limited range of light and sedentary work at the light level" would be available to Plaintiff, including working as a mail clerk, an unarmed security guard/night watchman, a courier/messenger, a sorter/inspector, or a hand packer.  The VE opined that in the State of Tennessee, there were approximately 1,594 jobs as a mail clerk, 1,388 jobs as a unarmed security guard/night watchman, 3,025 jobs as a courier/messenger, 376 jobs as a sorter/ inspector at the sedentary level with an additional 3,765 jobs at the light level, and 343 jobs as a hand packer at the sedentary level with an additional 5,599 jobs at the light level, all of which would be appropriate for the hypothetical claimant.  (AR 292–93.)

The ALJ then asked the VE to consider the Mental RFC Assessment performed by the DDS evaluator in Exhibit 10F, which indicated "marked limitations in understanding, remembering, and carrying out detailed instructions, and in working or interacting appropriately with the general public."  (AR 293; 146–49.)  That Mental RFC Assessment also reported "moderate difficulty maintaining attention and concentration for extended periods, completing a normal workday or workweek without interruption from psychologically-based symptoms, and responding appropriately to changes in the work setting."  (*Id.*)

The VE responded that those psychological limitations would "cut the security guard jobs by about 50 percent." (AR 293.) The VE opined that such psychological limitations would also "rule out the mail clerk job" and "the courier job," but that the factory jobs identified – hand-pack and sorter/inspector – would still be available. (*Id.*)

The ALJ then asked the VE to consider the limitations described in Exhibit 17F, another DDS evaluator's Mental RFC Assessment, in which the evaluator described "moderate limitations [in] carrying out detailed instructions, maintaining attention and concentration for extended periods, working in coordination with or proximity to others, completing a normal workday or work week without interruptions from psychologically-based symptoms." (AR 293–94; 230–32.) The evaluator also described "moderate ability interacting with the public, accepting instructions, and responding appropriately to criticism, [and] to changes in the work setting." (*Id.*) The VE responded that such limitations "would allow all the jobs, and the numbers [he] originally gave." (AR 294.)

The ALJ then asked the VE to consider Exhibit 19F, another Physical RFC Assessment, in which DDS physician Dr. Hobbs described "light work [and] occasional postural activities," advising Plaintiff to "avoid extremes of heat and cold." (AR 294; 247–52.)

The VE responded that "the postural limitations that are in that evaluation would rule out the light jobs of sorter, inspector, and hand packer, [but] the sedentary jobs would stay available," as would the "other jobs" of a mail clerk, courier/messenger, and security guard/night watchman. (AR 294.)

The ALJ then asked the VE to consider Exhibit 20F, a Medical Source Statement of Ability to do Work-Related Activities, in which Dr. Hobbs described "lifting less than ten pounds frequently, and occasionally standing and walking less than two hours out of eight." (AR 294; 253–56.) Dr. Hobbs also indicated "no postural activities" and "limited" reaching abilities. (*Id.*) The VE responded that such characteristics would limit Plaintiff to "less than sedentary work." (AR 294.)

The ALJ then asked the VE to consider "a number of Global Assessments of Functioning rendered in the file by various sources." (AR 294.) The VE responded that "a person who's functioning at 50 or below not be able to work on a full-time basis." (AR 295.) The VE further responded that a person who was scoring in the 51 to 55 range would be capable of performing the previously identified jobs. (*Id.*)

III.     **CONCLUSIONS OF LAW**

A.       **Standard of Review**

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process.  *Jones v. Sec'y of Health & Human Servs.*, 945 F.2d 1365, 1369 (6th Cir. 1991).  The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision.  *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion."  *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389 (6th Cir. 1999) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  "Substantial evidence" has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance."  *Bell v. Comm'r of Soc. Sec.*, 105 F.3d 244, 245 (6th Cir. 1996) (citing *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

The reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences.  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached.  *Her*, 203 F.3d at 389 (citing *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).  However, if the Commissioner did not consider the record as a whole, the Commissioner's conclusion is undermined. *Hurst v. Sec'y of Health & Human Servs.*, 753 F.2d 517, 519 (6th Cir. 1985) (citing *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980) (citing *Futernick v. Richardson*, 484 F.2d 647 (6th Cir. 1973))).

In reviewing the decisions of the Commissioner, courts look to four types of evidence:  (1) objective medical findings regarding Plaintiff's condition; (2) diagnosis and opinions of medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age, education, and work experience. *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6th Cir. 1965).

B.       **Proceedings At The Administrative Level**

The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical

or mental impairment which can be expected to last for a continuous period of not less than 12 months."

42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" not only includes previous work performed by

Plaintiff, but also, considering Plaintiff's age, education, and work experience, any other relevant work

that exists in the national economy in significant numbers regardless of whether such work exists in the

immediate area in which Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would

be hired if he or she applied. 42 U.S.C. § 423(d)(2)(A).

At the administrative level of review, the claimant's case is considered under a five-step

sequential evaluation process as follows:

(1) If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.

(2) If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.

(3) If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[2] or its equivalent. If a listing is met or equaled, benefits are owing without further inquiry.

(4) If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations). By showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a prima facie case of disability.

(5) Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

20 C.F.R. §§ 404.1520, 416.920 (footnote added). *See also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th

Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be satisfied by relying

on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not

significantly limited by a nonexertional impairment, and then only when the claimant's characteristics

identically match the characteristics of the applicable grid rule. Otherwise, the grid cannot be used to

direct a conclusion but only as a guide to the disability determination. *Id.* In cases where the grid does

not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima*

*facie* case of disability by coming forward with particularized proof of the claimant's individual vocational

---

[2] The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, App. 1.

qualifications to perform specific jobs, which is typically obtained through vocational expert testimony. *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity for purposes of the analysis required at stages four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments; mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. § 423(d)(2)(B).

C.     **Plaintiff's Statement Of Errors**

Plaintiff contends that (1) the ALJ failed to consider and properly weigh the opinions of Plaintiff's treating and examining mental health professionals; (2) the ALJ "misapplied his duty and discretionary authority to assess the credibility of evidence when he assessed [Plaintiff] as not credible and then failed to assess the credibility of [Plaintiff's] treating mental healthcare professionals"; and (3) the hypothetical questions posed by the ALJ were based upon the least restrictive opinions of the state agency consultants and therefore did not accurately reflect the severity of Plaintiff's impairments.  (Doc. No. 10, at 15—25.).   Accordingly, Plaintiff maintains that, pursuant to 42 U.S.C. § 405(g), the Commissioner's decision should be reversed, or in the alternative, remanded.

Sentence four of § 405(g) states as follows:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.

42 U.S.C. § 405(g).

"In cases where there is an adequate record, the Secretary's decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking."  *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985).  Moreover, a court can reverse the decision and immediately award benefits if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits.  *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).  S*ee also Newkirk v. Shalala*, 25 F.3d 316, 318 (1994).

### 1. *Weight Accorded the Opinions of Plaintiff's Treating and Examining Physicians*

Plaintiff argues that "[t]his case should be remanded because the ALJ failed to consider and weigh properly the opinions of [Plaintiff's] treating and examining mental health professionals." (Doc No. 10, at 15.)  Plaintiff contends that "all the mental healthcare professionals who treated or examined [Plaintiff] assessed the severity of his mental problems as disabling under the Commissioner's regulations," but the ALJ "ignored this fact and instead selectively parsed [Plaintiff's] medical records for statements that, when considered out of context, appeared to support a denial of [his] claim." (Doc. No. 5, at 15.)  More specifically, Plaintiff argues that the ALJ failed to comply with the Regulations "when he rejected the opinions of [Plaintiff's] treating psychologist [Dr. Hall], when he selectively used the [sic] and alternatively rejected portions of the state agency examining consultant report [Crawford/ Profitt/Yarbrough], when he refused to consider the opinion of [Plaintiff's] therapist [David Highfield] because he was not an 'acceptable medical source' as that term is defined by 20 C.F.R. 404.1513(a)(1)-(5), and when he gave great weight to the opinion of the state agency non-examining consultant [Dr. Pestrak]." (Doc. No. 10, at 16.)

With regard to the evaluation of medical evidence, the Code of Federal Regulations states:

> Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
>
> (1)  Examining relationship.  Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
>
> (2) Treatment relationship.  Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.  If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.  When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. . . .
>
> (3) Supportability.  The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.  The better an explanation a source provides for an opinion, the more weight we will give that opinion. . . .

> (4) Consistency.  Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

> (5) Specialization.  We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist. . . .

20 C.F.R. § 416.927(d); *cf.* 20 C.F.R. § 404.1527(d).

If the ALJ rejects the opinion of a treating source, he is required to articulate some basis for rejecting the opinion.  *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987).  The Code of Federal Regulations defines a "treating source" as "your own physician, psychologist, or other acceptable medical source who provides you or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you."  20 C.F.R. § 404.1502.

Plaintiff first argues that the ALJ erred in not according greater weight to the opinions expressed by Dr. Hall in her December 2004 letter in support of him.  Dr. Hall treated Plaintiff monthly for 19 months, which is an extensive period of time, a fact that would justify the ALJ's giving greater weight to her opinions than to other opinions, as long as her opinions were well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence of Record.  20 C.F.R. § 416.927(d).

In her December 2004 letter on behalf of Plaintiff, Dr. Hall indicated, *inter alia*, that Plaintiff had "greatly developed his self control" and had "gained more inner peace . . . , along with mood stabilization." (AR 274.)  She further stated that "when flashbacks or other PTSD symptoms occur, [Plaintiff] is better able to accept and manage them."  (*Id.*).  Despite these improvements, however, Dr. Hall concluded: "There is, in my and his opinion, no question about his ability to hold a job.  He cannot, must not."  (*Id.*) Dr. Hall refused to provide any treatment records or objective support for her findings and conclusions. "Because she refused to disclose her notes and the objective signs and findings recorded therein, if any, that support[ed] her diagnosis," the ALJ assigned less weight to her opinions.  (AR 23.)

Although Dr. Hall was a treating source whose opinion could be accorded great weight, because Dr. Hall failed to present any records demonstrating "medically acceptable clinical and laboratory diagnostic techniques" or any "medical signs and laboratory findings," the ALJ was not bound to accept

the conclusions in her letter and the ALJ's decision to accord less weight to Dr. Hall's opinions was not improper.

Plaintiff next argues that the ALJ erred in accepting those portions of the Crawford/ Proffitt/Yarborough consultative examination that supported his determinations, while rejecting other portions of it. Plaintiff contends that the ALJ cannot disregard the opinions of a medical consultant that are favorable to him. (Doc. No. 10, at 20 (citing *Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048 (6th Cir. 1983)).)

The ALJ thoroughly discussed the opinions set forth in the Crawford/Proffitt/Yarborough evaluation and compared those opinions to the other evidence of record. (AR 24.) When so doing, the ALJ found inconsistencies, which he appropriately considered. When there is contradictory evidence in the Record, the ALJ has a duty to resolve the conflicts in the medical evidence, and the final decision regarding the weight to be accorded lies with the Commissioner. *See, e.g.*, *Hardaway v. Sec'y of Health & Human Servs.*, 823 F.2d 922, 927 (6th Cir. 1987); 20 C.F.R. § 416.927(e)(2). Because of the inconsistencies between this assessment and the other evidence of record, the ALJ accepted those portions of the evaluation that were consistent with the evidence of record he deemed credible and rejected those that were not.

The ALJ found that the medical opinion that Plaintiff had mild to moderate mental limitations was supported by clinical findings and diagnostic techniques and was consistent with other substantial medical evidence in the record. (AR 24.) As a result, the ALJ found that this portion of the report was entitled to great weight, and that it demonstrated no more than moderate mental limitations. (*Id.*) This determination was in accordance with the Regulations, which state that "the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion." 20 C.F.R. § 416.927(d).

With regard to discounting portions of the evaluation, the ALJ clearly articulated his reasoning for rejecting the portion of the evaluation regarding Plaintiff's social functioning. (AR 24.) The assessment found that Plaintiff suffered from a severe limitation in social functioning, yet the ALJ noted that this finding was inconsistent with the record as a whole. (*Id.*) The ALJ observed that Ms. Crawford assessed Plaintiff's social limitations as "severe" when she examined him in October. (*Id.*) He further noted, however, that progress reports from Centerstone Mental Health Center indicated that Plaintiff had not

been taking his medication due to financial difficulties, but that, in June 2002, Plaintiff received money from a church to purchase his prescriptions, and that "within days, [his] mental symptoms were much improved." (*Id.*) A late August 2002 treatment note indicated that Plaintiff needed refills of his medication. (AR 120.) The ALJ accordingly reasoned that the medication that Plaintiff had purchased with the money from the church in June must have been gone by October, and that this lack of medication lead to Plaintiff's condition and Ms. Crawford's assessment of Plaintiff's social limitations as "severe." (*Id.*) Because of Plaintiff's improvement when on medication, the ALJ ultimately determined that "a finding of moderate limitation in social functioning" was the "ongoing level of limitation" reflected in the record, and that the portion of the report reflecting a "severe limitation" was inconsistent with the rest of the record. (*Id.*)

As discussed above, when there is contradictory evidence in the Record, the final decision regarding the weight to be given to the differing opinions lies with the Commissioner. Since the portion of the Crawford/Proffitt/Yarborough evaluation regarding the severity of Plaintiff's social functioning was inconsistent with other substantial evidence in the record, and the ALJ was not bound to accord it controlling weight. The decision to reject this portion of the report was within the ALJ's province.

Plaintiff next argues that the ALJ erred in according limited weight to the treatment notes and opinions of Plaintiff's therapist, David Highfield. The ALJ, in his decision, recognized that Mr. Highfield opined that Plaintiff had "marked mental limitations." (AR 23.) The ALJ observed, however, that Mr. Highfield was "not a M.D. or Ph.D," and thus was not an acceptable source for purposes of diagnosing an impairment, or for the purposes of offering an opinion on the limitations imposed by an impairment. (*Id.*)

According to the Regulations, only statements from physicians, psychologists, or "other acceptable medical sources" are accepted as evidence to establish an impairment. *See* 20 C.F.R. § 404.1513, 20 C.F.R. § 416.1527(a)(2). It is undisputed that Mr. Highfield is not a physician, psychologist, or "other acceptable medical source." The issue is whether Mr. Highfield, as Plaintiff's therapist, is an "other source," such that his opinion should be accorded great weight.

20 C.F.R. § 404.1513(d) defines "other sources" as follows:

(d) Other sources. . . . In addition to evidence from the acceptable medical sources listed in paragraph (a) of this section, we may also use evidence from other sources to show the severity of your impairment(s) and how it affects your ability to work. Other sources include, but are not limited to –

(1) Medical sources not listed in paragraph (a) of this section (for example, nurse-practitioners, physicians' assistants, naturopaths, chiropractors, audiologists, and therapists) . . . .

Because Mr. Highfield is one of Plaintiff's therapists, he is an acceptable "other source" whose opinion may be considered to establish the severity of Plaintiff's impairments. 20 C.F.R. § 404.1513(d). As has been discussed above, however, although the ALJ may consider Mr. Highfield's opinion, he is not bound to accord it controlling weight if it conflicts with other substantial evidence of record. After reviewing the record as a whole, the ALJ found that Mr. Highfield's opinion was contradictory within itself and inconsistent with other evidence, and hence lacked evidentiary support from the Record. Specifically, the ALJ found that the evidence did not support a finding that Plaintiff had "marked mental limitations." This finding was within the ALJ's province.

Finally, Plaintiff argues that the ALJ erred in according great weight to the opinions of the non-examining DDS psychologist, Dr. Pestrak. In that regard, the ALJ noted that Dr. Pestrak's medical opinion reflected that Plaintiff had moderate mental limitation in the areas of sustained concentration and persistence, social interaction and adaptation, and that this assessment was supported by substantial clinical findings and diagnostic techniques. (AR 23.) The ALJ further noted that "Dr. Pestrak is a specialist with considerable understanding of our disability programs." (*Id.*) The ALJ concluded, therefore, that Dr. Pestrak's assessment was entitled to great weight. (*Id.*) Dr. Pestrak is a specialist whose opinion was consistent with other evidence of Record and supported by substantial clinical findings. The ALJ's decision, therefore, was proper.

### 2. *Credibility Determinations*

Plaintiff argues that the ALJ "misapplied his duty and discretionary authority to assess the credibility of evidence when he assessed [Plaintiff] as not credible and then failed to assess the credibility of [Plaintiff's] treating mental healthcare professionals." (Doc. No. 10, at 24.) Plaintiff acknowledges that his "personal credibility is not an issue in this case," but argues that, "what matters is whether his treating source records and opinions were credible." (*Id.* (citing *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388 (6th Cir. 1999)).) Plaintiff argues that the ALJ erroneously failed to address the credibility of Plaintiff's treating mental healthcare professionals.

Despite Plaintiff's argument that the ALJ was bound to assess the credibility of Plaintiff's treating mental healthcare professionals, the Regulations do not so require. Rather, the Regulations require, *inter alia*, that the ALJ fully and fairly develop the record, that he consider all the evidence before him, that he resolve issues of conflicting evidence, and that he clearly articulate his reasons for accepting and rejecting pieces of evidence. The ALJ in the case at bar provided a detailed decision that clearly recounts the evidence and that articulates his rationale. The ALJ has complied with the Regulations and Plaintiff's argument fails.

### 3. Hypothetical Questions Posed to the VE

Plaintiff argues that the ALJ erred in framing his hypothetical questions to the VE by basing the hypotheticals entirely on the opinions and assessments of state agency consultants. Specifically, Plaintiff contends that the hypothetical questions posed by the ALJ were based upon the least restrictive opinions of the state agency consultants and therefore did not accurately reflect the severity of Plaintiff's impairments

An ALJ must only include in a hypothetical question to a vocational expert those limitations that the ALJ finds credible and that are supported by medical findings. *See, e.g.*, *Foster v. Halter*, 279 F.3d 348, 356 (2002). The ALJ may rely upon a vocational expert's answer to a hypothetical question if substantial evidence supports the assumptions included in the hypothetical question. *Felisky v. Bowen*, 35 F.3d 1027, 1036 (1994); *Hardaway v. Sec'y of Health & Human Servs.*, 823 F.2d 922, 927-928 (1987; *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (1987).

As has been discussed, the Record contains contradictory evidence that was properly considered by the ALJ. The ALJ made credibility determinations and found that some of the alleged limitations were not supported by objective medical findings. The ALJ was not bound to include these limitations in his hypothetical questions to the VE. The ALJ in the case at bar included in his hypotheticals those limitations he deemed credible. Plaintiff's argument fails.

### 4. Substantial Evidence

In general, Plaintiff implies that substantial evidence did not support the ALJ's determination that Plaintiff was not disabled within the meaning of the Regulations. As previously explained, "substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the

conclusion," *Her*, 203 F.3d at 389 (citing *Richardson*, 402 U.S. at 401), and has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell*, 105 F.3d at 245 (citing *Consol. Edison Co.*, 305 U.S. at 229).

The record here is replete with evidence that was properly considered by the ALJ. In addition, the ALJ's decision demonstrates that he carefully considered the testimony of both Plaintiff and the VE. While it is true that some of the testimony and evidence supports Plaintiff's allegations of disability, it is also true that much of the evidence supports the ALJ's findings and conclusions.

As has been noted, the reviewing court does not substitute its findings for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences. *Garner*, 745 F.2d at 387. In fact, even if the evidence could also support a different conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (citing *Key*, 109 F.3d at 273). The ALJ's decision was properly supported by "substantial evidence;" the ALJ's decision, therefore, must stand.

## IV.    CONCLUSION

For the reasons discussed above, Plaintiff's Motion for Judgment on the Administrative Record will be denied and the decision of the Commissioner affirmed. An appropriate order will enter.


_____
Thomas A. Wiseman, Jr.
Senior U.S. District Judge